Opinion issued August 16, 2007






 











In The

Court of Appeals

For The

First District of Texas






NO. 01-05-01148-CR






ALBERT PAUL DURAND, JR., Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause No. 1014716








MEMORANDUM OPINION

 A jury convicted appellant, Albert Paul Durand, Jr., of capital murder. (1) 
Because the State did not seek the death penalty, the trial court imposed an automatic
sentence of life imprisonment. In five points of error, appellant contends that (1) the
evidence is legally and factually insufficient to prove that he formed the intent to rob
the deceased prior to or during the commission of the murder; (2) the evidence is
factually insufficient to prove that appellant participated in the murder or robbery of
the deceased; (3) the trial court erred when it admitted testimony from the deceased's
mother that was irrelevant, inflammatory, and inadmissible victim impact and
character evidence; and (4) the trial court erred during the State's closing argument
(a) when it denied his request for a mistrial and (b) when it overruled his objection
to the State's misstatement of the law.

 We affirm.

FACTS

 On the evening of March 24, 2003, Kartisha Jones left her apartment around
10:00 p.m. to go to a dance club. As she drove away, she passed by Nathan Bradley
Abraham ("Abraham") sitting in his parked truck, and he waved to her. Between 35
and 45 minutes later, Jones returned to her apartment because she had forgotten her
earrings. On her way back to her car, a police officer stopped Jones and asked if she
had heard any gunshots; she told him that she had not. She again started to drive to
the dance club, but she noticed that the passenger-side door of Abraham's truck was
open. Jones parked her car, walked up to the passenger side of his truck, and found
that Abraham had been shot. His body was seated in the driver's seat of his truck, his
right arm extended to the side and the palm of his right hand facing up. Abraham's
pistol-grip gun was on the floor of his truck on the driver's side. A resident of the
apartment complex heard Jones screaming and called for an ambulance. 

 From Abraham's cell phone, Detective R. Swainson determined that Abraham
had been in contact that evening with a person whose telephone number was stored
in the phone under "A." He traced the number to a cell phone owned by Kimberly
Long. After doing some research, Swainson determined that Long's boyfriend was
named Albert Durand. According to Long, appellant had her cell phone on the night
of the shooting. Detective Swainson also found that Long had reported a .45 caliber
weapon stolen from her home. This was significant to him because .45 caliber and
9 mm (2) shell casings had been recovered at the scene of the murder.

 On November 23, 2004, someone made a phone call to police that led
Swainson to interview Ricky McKinney, who was incarcerated at the time. Based on
his conversation with McKinney, Swainson decided to find and interview appellant,
Shea Lewis, Gregory Hurst, Larry Collins, Kimberly Long, and Angel Allen. 

 At trial, Lewis testified that appellant both used and sold codeine, that he had
purchased codeine from appellant more than 50 times, and that, more than once,
including the night of the shooting, he had accompanied appellant to purchase
codeine from Abraham. 

 Lewis further testified that on the night of the shooting, he had driven into
Houston from La Marque with Collins, Hurst, and appellant, who was driving. 
Appellant eventually stopped at an apartment complex somewhere in Houston. 
Appellant got out of the car, walked up to Abraham's truck, and got in; Collins,
Lewis, and Hurst stayed in the car. Appellant then returned to his car, opened the
door, and, when Lewis asked what he was doing, said, "I am acting like I am looking
for some money." Appellant then got out of the car and began walking back to
Abraham's truck. Collins also got out and followed appellant to Abraham's truck. 
Lewis then saw appellant open the passenger door of Abraham's truck and shoot into
the truck; Lewis also saw Collins shoot into the truck. Before the shooting began,
Lewis testified that he had not seen either gun that night and that he had not seen an
exchange of guns between appellant and Collins. After the shooting stopped, Lewis
testified that he saw appellant reach into the truck and grab a duffel bag that, he later
learned, contained codeine. Appellant and Collins then ran back to the car, and they
drove away.

 On cross-examination, Lewis admitted that before the shooting, he had smoked
marijuana and had consumed Xanax and that, as a result, he could not remember
everything that had happened that night. He also admitted that in May 2003, he,
appellant, and appellant's cousin had been arrested in Louisiana for possession of
codeine, marijuana, cocaine, and Oxcycoton, none of which, except for a "little
marijuana," belonged to Lewis. Most of these drugs, according to Lewis, belonged
to appellant. Although Lewis denied being angry at appellant for what had happened
in Louisiana, Lewis did admit that appellant could have claimed that he, not Lewis,
owned most of the drugs for which they had been arrested. Lewis further admitted
that he had told Cooper that appellant had wronged him in Louisiana, but denied
telling her that appellant had not shot Abraham. Lewis did acknowledge, however,
that if he had really seen appellant shoot Abraham he would not have continued to
"hang out" with him.

 Hurst also testified that, on the night of the shooting, he had driven into
Houston from LaMarque with Collins, Lewis, and appellant. According to Hurst,
appellant eventually stopped the car, got out, walked up to a truck, and began to talk
to someone. Hurst, "low" on Xanax, then fell asleep, but was soon awakened by the
sound of gunshots. He then saw appellant and Collins running back to the car, and
they drove away. Hurst testified that, as Collins and appellant were running back to
the car, Collins was carrying a duffel bag. Collins then got into the back seat of the
car with Hurst, put a gun to his head, and threatened him not to say anything to
anyone about what had just happened. Collins then opened the duffel bag and pulled
out five or six pints of codeine. Later in his testimony, however, when the State
asked if he saw appellant reach into Abraham's truck and grab the duffel bag, Hurst
said, "I seen somebody lean and snatch something out of the car." Hurst
acknowledged, however, that he had told Detective Swainson that appellant had
grabbed the bag. 

 When asked whether he had seen appellant fire any shots, Hurst replied, "No,
I didn't seem him shoot. Really, I ain't seen him shoot. The gunshots is what woke
me up." Hurst acknowledged, however, that he told Detective Swainson that he had
seen both appellant and Collins fire shots. The State also asked Hurst if appellant had
a gun in his hand as he was running back to his car after the shooting. Hurst replied,
"I was in the back seat. I don't remember that. I don't think he had no gun in his
hand. I can't remember if he did," but then later testified, "I didn't see [appellant]
with no gun at the time of the shooting." Hurst also testified that he had seen both a
silver and a black gun that night and that he had seen both guns at appellant's house
in the past. Lewis testified that he had seen both guns at appellant's house as well.

 Lewis further testified that, at the time of the shooting, appellant "was stressing
a lot about money, about not having money," and Hurst testified that he believed that
appellant "needed a little money" to get ready for the birth of his daughter. 

 Detective Swainson testified that he had conducted a tape-recorded interview
of appellant. According to Detective Swainson, appellant admitted that, on the night
of the shooting, he was involved in a drug deal and had stood at the passenger side
of Abraham's truck; he had Long's phone and had called Abraham; and he had two
guns in his car. According to Detective Swainson, appellant also admitted to
participating in the shooting. Up to that point, however, appellant had maintained
that there was no plan to steal the codeine that night and that he was not the shooter. 
Appellant claimed, rather, that Collins had shot both guns and had also reached for
the duffel bag holding the codeine. Appellant also told Detective Swainson that there
was no plan to rob Abraham that night.

 As its final witness, the State called Abraham's mother, Bertha Abraham. After
asking some preliminary questions, the State asked about Abraham, her youngest
child. Defense counsel immediately objected to any testimony from Bertha beyond
that needed for identification. The trial court sustained his objection, admonishing the
State, "No character evidence. No victim impact evidence." The State continued,
questioning Bertha about what Abraham's family called him, his age and where he
was living at the time of his death, his birth date and whether he had received any
money on his last birthday, what type of vehicle he drove, his education, career plans,
and his athletic activities. This testimony elicited several objections from the defense,
some of which the court sustained and others the court overruled. At one point,
defense counsel requested a mistrial, which the court denied.

 In his defense, appellant called one witness, Kimberly Cooper. Cooper
testified that she had spoken to Lewis at a party in April 2005 about what had
happened on the night of the shooting. According to Cooper, when she told Lewis
that they both knew that appellant had not shot Abraham, Lewis agreed, saying,
"[Y]es, I know he didn't."

 Although appellant had been indicted for capital murder, the jury charge also
gave the jury the option of convicting appellant of murder or aggravated robbery. 
Regarding these options, the State twice argued that just because something was
included in the charge--capital murder, murder, aggravated robbery, self-defense--didn't mean that the judge thought it appropriate or that the judge thought
the jury ought to even look at it. The State also argued, among other things, that

 [Appellant] isn't someone to have any sympathy for at all. There is
nothing that he has done in this case that makes you or should make you
have one iota of sympathy for him. He has shown no remorse. He has
not shed one tear. He doesn't care. And this family sits up here day
after day listening to their son's name being dragged through the mud. 
Today is the day that needs to end because this is not only justice for
Albert P. Durand but it's justice for Nathan Bradley Abraham.

 After deliberating for more than 11 hours, the jury sent a note to the judge
stating:



 The jury has reached an apparent impasse at this time with votes divided
between capital murder, murder, and aggravated robbery. We have . . .
deliberated for 11+ hours and feel like there is little chance of conflict
resolution. Can you kindly direct us on whether we are required to
deliberate for a minimum duration?


The trial court responded with an order for the jury to continue its deliberations, and
the jury ultimately found appellant guilty of capital murder.

SUFFICIENCY OF THE EVIDENCE 

 In his first and second points of error, appellant challenges the legal and
factual sufficiency of the evidence. Legal Sufficiency

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. 
Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000); King v. State, 29
S.W.3d 556, 562 (Tex. Crim. App. 2000). Although our analysis considers all the
evidence presented at trial, we may not re-weigh the evidence and substitute our
judgment for that of the fact finder. King, 29 S.W.3d at 562.

 Factual Sufficiency

 We begin the factual sufficiency review with the presumption that the evidence
supporting the jury's verdict is legally sufficient. Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996). We view all of the evidence in a neutral light, (3) and we
will set the verdict aside only if the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or the verdict is against the great weight and
preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 10-11 (Tex. Crim.
App. 2000). Regarding the second basis for a finding of factual insufficiency, "an
appellate court must . . . be able to say, with some objective basis in the record, that
the great weight and preponderance of the (albeit legally sufficient) evidence
contradicts the jury's verdict before [the court] is justified in exercising its appellate
fact jurisdiction to order a new trial." Watson v. State, 204 S.W.3d 404, 417 (Tex.
Crim. App. 2006). For a review of factual sufficiency, we must consider the most
important evidence that the appellant claims undermines the verdict. Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

The Law

 Under the Texas Penal Code, a person commits the offense of capital murder
when he intentionally causes the death of an individual during the course of
committing or attempting to commit robbery. Act of June 19, 1993, 73rd Leg., R.S.,
ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3613 (amended 2003). A person
commits robbery when, in the course of committing theft and with intent to obtain or
maintain control of the property, he "intentionally, knowingly, or recklessly causes
bodily injury to another." Tex. Pen. Code Ann. § 29.02(a)(1) (Vernon 2003). The
Penal Code defines "in the course of committing theft" as "conduct that occurs in an
attempt to commit, during the commission, or in immediate flight after the attempt or
commission of theft." Id. § 29.01(1) (Vernon 2003). The Court of Criminal Appeals
has held that this definition also applies to the "in the course of committing" language
found in the capital murder statute. (4) See Ibanez v. State, 749 S.W.2d 804, 807 (Tex.
Crim. App. 1986), overruled on other grounds by Russeau v. State, 785 S.W.2d 387,
390 (Tex. Crim. App. 1990). 

Participation in Murder and Robbery

 In his second point of error, appellant contends that the evidence is factually
insufficient to prove that he participated in the killing and robbery of Abraham. More
specifically, he argues that the State did not meet its burden of proof of beyond a
reasonable doubt because Lewis's testimony, on which appellant's conviction was
based almost entirely, was very weak due to contradictions in his testimony,
contradictory testimony from three other witnesses, and the fact that he held a grudge
against appellant, which gave him a reason to lie. 

 On direct examination, Lewis testified that from his position in appellant's car,
which was parked behind Abraham's truck, he saw appellant open the passenger door
of the truck and both appellant and Collins fire shots inside the truck. Once the
shooting had stopped, Lewis testified that he saw appellant reach into the truck and
pull out a duffel bag that he later learned contained codeine. On cross-examination,
Lewis admitted that before the shooting, he had smoked marijuana and had consumed
Xanax and that, as a result, he could not remember everything that happened that
night. 

 Lewis also admitted that in May 2003 he had been arrested in Louisiana with
appellant for possession of codeine, marijuana, cocaine, and Oxcycoton, most of
which belong to appellant, except for a "little marijuana" that belonged to Lewis. 
Although Lewis denied being angry at appellant for his arrest, Lewis did admit that
appellant could have claimed that he, not Lewis, owned most of the drugs for which
they had been arrested. Lewis also acknowledged that he had told Cooper that
appellant had wronged him in Louisiana. Cooper testified that when she told Lewis
that they both knew that appellant had not shot Abraham, Lewis agreed. Lewis,
however, denied ever telling Cooper that appellant had not shot Abraham.

 Hurst, the only other passenger in appellant's car, testified that he was asleep
in appellant's car when the sound of gunshots awakened him. He then saw
"somebody lean and snatch something" out of Abraham's truck, and he saw appellant
and Collins running back to the car. Hurst testified that Collins was carrying a duffel
bag as he and appellant were running back to the car. Hurst acknowledged, though,
that he had told Detective Swainson that appellant, not Collins, had grabbed the bag
from Abraham's truck. When asked whether he had seen appellant fire any shots,
Hurst replied that he had not because the gunshots had awakened him. Hurst also
acknowledged, however, that he told Detective Swainson that he had seen both
appellant and Collins fire shots. The State also asked Hurst if appellant had a gun in
his hand as he was running back to his car after the shooting. Hurst replied, "I was
in the back seat. I don't remember that. I don't think he had no gun in his hand. I
can't remember if he did," but he later testified, "I didn't see [appellant] with no gun
at the time of the shooting."

 According to Detective Swainson, appellant admitted to participating in the
shooting during a tape-recorded interview. Detective Swainson acknowledged that
up to that point, however, appellant had maintained that he was not the shooter. 
Appellant had claimed, rather, that Collins had shot both guns and had also reached
for the duffel bag holding the codeine. 

 Viewing this evidence in a neutral light, we conclude that the proof that
appellant participated in the killing and robbery of Abraham is neither so weak that
the verdict was clearly wrong and manifestly just; nor is the verdict against the great
weight and preponderance of the evidence. See Johnson, 23 S.W.3d at 10-11. 
Furthermore, appellant's argument goes to the credibility of Lewis as a witness,
which is a matter for the determination of the jury. See Guajardo v. State, 176
S.W.3d 402, 405 (Tex. App.--Houston [1st Dist.] 2004, pet. ref'd). Our evaluation
may not intrude upon the fact finder's role as the sole judge of the weight and
credibility accorded any witness's testimony. Cain v. State, 958 S.W.2d 404, 407 n.5
(Tex. Crim. App. 1997). What weight to be given contradictory testimonial evidence
is within the sole province of the fact finder because it turns on an evaluation of
credibility and demeanor. Id. at 408-09. The fact finder may choose to believe all,
some, or none of the testimony presented. Hughes v. State, 897 S.W.2d 285, 289
(Tex. Crim. App. 1994). We must defer appropriately to the fact finder to avoid
substituting our judgment for its judgment. See Johnson, 23 S.W.3d at 12. Thus, the
jury was free to discredit any contradictory evidence and believe Lewis's testimony
that appellant fired shots into Abraham's truck and grabbed the duffel bag containing
the codeine. A decision is not manifestly unjust merely because the jury resolved
conflicting views of the evidence in favor of the State. Cain, 958 S.W.2d at 410.

 We overrule appellant's second point of error.

Intent to Commit Robbery

 In his first point of error, appellant argues that the evidence is legally and
factually insufficient to prove that he formed the intent to rob Abraham before or
during the commission of the murder, and, therefore, the theft of the codeine was "an
afterthought, not an integral part of the crime." Thus, the evidence does not support
appellant's conviction for capital murder. We will first address the legal sufficiency
portion of this point of error.

 Legal Sufficiency

 Appellant argues that the evidence is legally insufficient to prove that he
formed the intent to rob Abraham before or during the commission of the murder
because: (1) the shooting was not discussed beforehand; (2) no plan to rob Abraham
was made; (3) no guns were seen before the shooting occurred; (4) no one saw him
hand a gun to Collins or heard appellant express an intent to rob Abraham; and
(5) appellant did not express such an intent in his statement to police. Appellant
further argues that the evidence that the police found marijuana and $125 in cash on
Abraham suggests that the theft of the codeine was an afterthought, not the purpose
of the shooting.

 Because a killing and an unrelated taking of property do not constitute capital
murder under section 19.03(a)(2), to obtain a capital murder conviction, the State
must prove a "nexus" between the murder and the theft--i.e., "that the murder
occurred in order to facilitate the taking of the property." Ibanez, 749 S.W.2d at 807. 
Proof that the robbery was committed as an afterthought and is unrelated to the
murder is not sufficient. Herrin v. State, 125 S.W.3d 436, 441 (Tex. Crim. App.
2002). Thus, the State must prove that the accused formed the intent to commit the
robbery prior to or at the time of the murder. Id.; Lee v. State, 964 S.W.2d 3, 8 (Tex.
App.--Houston [1st Dist.] 1997, pet. ref'd). Such intent can be inferred from the
acts, words, and conduct of the accused. Patrick v. State, 906 S.W.2d 481, 487 (Tex.
Crim. App. 1995); Lee, 964 S.W.2d at 8. For example, the jury can infer that the
accused formed the intent to rob prior to or during the commission of the murder from
the fact that the theft occurred immediately after the murder. Meeks v. State, 135
S.W.3d 104, 112 (Tex. App.--Texarkana 2004, pet. ref'd). The Court of Criminal
Appeals has held numerous times that proof that the robbery occurred immediately
after the commission of the murder is sufficient to prove that the murder was
committed in the course of committing the robbery. McGee v. State, 774 S.W.2d 229,
234 (Tex. Crim. App. 1989). 

 The record contains significant evidence from which the jury could have
inferred that appellant formed the intent to rob Abraham prior to the murder. First,
Lewis testified that he saw appellant shoot into the truck and that, once he had
finished shooting, appellant reached into the truck and grabbed a bag that Lewis later
learned contained codeine. That the theft of the codeine occurred immediately after
the murder is evidence from which the jury could have inferred that appellant had
formed the intent to rob Abraham prior to or at the time of the shooting. See McGee,
774 S.W.2d at 234; Meeks, 135 S.W.3d at 112. 

 Second, both Lewis and Hurst testified that, at the time of the shooting,
appellant was short of money. According to Lewis, appellant "was stressing a lot
about money, about not having money," and Hurst testified that he believed that
appellant "needed a little money" to get ready for the birth of his daughter. Lewis
further testified that appellant both used and sold codeine, that he had purchased
codeine from appellant more than 50 times, and that, more than once, including the
night of the shooting, he had accompanied appellant to purchase codeine from
Abraham. On the night of the shooting, however, according to Lewis, appellant did
not have any codeine. Moreover, in his statement to police, appellant admitted that
on the night of the shooting, he wanted to buy and consume codeine.

 Third, on the night of the shooting, appellant first spoke to Abraham alone.
Appellant then returned to his car, opened the door, and, when asked what he was
doing, said, "I am acting like I am looking for some money." Appellant then got out
of the car and began walking back to Abraham's truck; Collins also got out of the car
and followed appellant to Abraham's truck. Lewis then saw appellant open the
passenger door of Abraham's truck and shoot into the truck; Lewis also saw Collins
shoot into the truck. After the shooting stopped, Lewis testified that he saw appellant
reach into the truck and grab the bag of codeine. Appellant and Collins then ran back
to the car, and they drove away. 

 Based on the foregoing evidence, we conclude that the jury could have inferred
that appellant, prior to the shooting, had formed the intent to steal the codeine from
Abraham. See Herrin, 125 S.W.3d at 441; Lee, 964 S.W.2d at 8. The fact that the
State presented no evidence of a plan to rob or a discussion about the shooting of
Abraham is irrelevant. The State is not required to present direct evidence of intent
for the evidence to be legally sufficient, only some evidence upon which rational
inferences can be made. See Herrin, 125 S.W.3d at 443. Moreover, the fact that the
police found marijuana and $125 dollars in cash on Abraham does not establish that
the theft of the codeine was an afterthought; the jury was free to infer that appellant
stole only the codeine because he did not know about the marijuana or the money or
that he intended to steal only the codeine. 

 After reviewing the evidence in the light most favorable to the verdict, we hold
that there is sufficient evidence from which a rational trier of fact could have found
that appellant formed the intent to rob Abraham prior to or during the commission of
the murder. See Wesbrook, 29 S.W.3d at 111.

 We overrule the legal sufficiency portion of appellant's first point of error.

 Factual Sufficiency

 Appellant also argues that the evidence is factually insufficient to prove that
he formed the intent to rob Abraham before or during the commission of the murder
because the State presented no evidence that he and Collins planned to rob Abraham,
no one saw appellant hand a gun to Collins, and he and Collins did not get out of the
car together. We disagree. Lewis testified that he saw appellant shoot into
Abraham's truck and then immediately reach into the truck and grab the bag of
codeine, proof that appellant formed the intent to rob prior to or during the
commission of the murder. See Meeks, 135 S.W.3d at 112. Thus, after neutrally
examining all the evidence set out above, we find that the proof that appellant had
formed the intent to rob Abraham prior to or during the commission of the murder
was not so weak that the verdict is clearly wrong and manifestly unjust, nor is the
verdict against the great weight and preponderance of the evidence. See Johnson, 23
S.W.3d at 10-11.

 We overrule the factual sufficiency portion of appellant's first point of error.

IMPROPER JURY ARGUMENT

 In his fourth point of error, appellant argues that the trial court erred in denying
his request for a mistrial after the State twice made an impermissible comment during
its closing argument concerning the judge's beliefs about the case. The State
contends that appellant failed to preserve any error arising from these arguments. 

 Appellant's argument under this point of error stems from the following
exchange: 

 [STATE]: The charge includes a lot of stuff. And I want to tell
you this: Just because something's in the
charge--meaning that you're looking at capital
murder, you're looking at murder, you're looking at
aggravated robbery, you're looking at self-defense
for Pete's sake. All of that and the kitchen sink is in
the charge. Just because it's in the charge doesn't
mean the Judge thinks it's appropriate; it doesn't
mean I think it's appropriate. It's in the charge for
you to consider. Don't at all think that because it's
in the charge [that] means it has some kind of
weight to it or it should be seriously considered.


 [DEFENSE]: I object, Judge. I'm going to object to that. 
Anything in the charge should be seriously
considered by the jury.


 [COURT]: The jury will refer to the Court's charge during their
deliberations. Follow the law within the charge.


 [STATE]: What I mean by that is: Self-defense? Come on. 
But that's in the charge for you to look at. It just
means that just because it's in the charge doesn't
mean that the Judge thinks you ought to look at it or
I think you ought to look at it. It just means it's in
the charge for you to consider and consider--


 [DEFENSE]: I'm going to object to what the Judge thinks they
should do. It's not relevant to any--that's like
telling them the Judge doesn't think you should look
at the charge.


 [STATE]: That's not what I'm saying.


 [COURT]: Let's move along.


 [STATE]: Now, in order to--


 [DEFENSE]: Can I get a ruling on my objection of improper
argument during closing argument?


 [COURT]: Sustained. Move along.


 [DEFENSE]: I move for a mistrial, Your Honor.


 [COURT]: Denied.


(Emphasis added).

 

Waiver


 In general, to preserve jury argument error, a contemporaneous objection must
be made and an adverse ruling obtained. Tex. R. App. P. 33.1 (stating that to preserve
error for review, party must object and trial court must explicitly or implicitly make
an adverse ruling or refuse to rule on that objection); Cooks v. State, 844 S.W.2d 697,
727 (Tex. Crim. App. 1992). If the trial court sustains the objection, the defendant
must then request an instruction to disregard the argument and, if granted, move for
a mistrial. Cooks, 844 S.W.2d at 727-28. When a defendant fails to object to a jury
argument or fails to pursue an objection to a jury argument to an adverse ruling, he
forfeits his right to complain about the jury argument on appeal. Cockrell v. State,
933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

 Here, the trial court implicitly sustained appellant's first objection to the State's
jury argument. See Tex. R. App. P. 33.1. The court then implicitly instructed the jury
to disregard the statement by instructing it to "refer to the Court's charge during their
deliberation" and "[f]ollow the law within the charge." Appellant renewed his
objection when the State repeated "just because it's in the charge doesn't mean that
the Judge thinks you ought to look at it" by specifically arguing that it was "not
relevant" and was "like telling [the jury] the Judge doesn't think [they] should look
at the charge." The trial court sustained the objection, and appellant moved for a
mistrial, which the court denied. Based on the foregoing, we conclude that appellant
pursued his objection to the State's improper jury argument to an adverse ruling and,
therefore, he has not forfeited his right to complain about the jury argument on
appeal. See Cockrell, 933 S.W.2d at 89. 

Improper Jury Argument

 The law provides for and presumes a fair trial free from improper jury
argument. Long v. State, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). In general,
proper jury argument encompasses one of the following: (1) a summation of the
evidence presented at trial; (2) a reasonable deduction drawn from that evidence;
(3) an answer to the opposing counsel's argument; or (4) a plea for law enforcement. 
Guidry v. State, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); Cole v. State, 194
S.W.3d 538, 544 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd). To determine
whether a party's argument properly falls within one of these categories, we must
consider the argument in light of the entire record. Cole, 194 S.W.3d at 544. When
an argument is outside one of these areas, an instruction to disregard the remarks will
normally cure the error. Schultze v. State, 177 S.W.3d 26, 43 (Tex. App.--Houston
[1st Dist.] 2005, pet. ref'd) (op. on motion for reh'g.). 

 The State's arguments to the jury that just because something is in the charge
does not mean the judge thinks that it is "appropriate" or that the jury "ought to look
at it" were both improper. Neither argument was a summation of the evidence, a
deduction drawn from the evidence, an answer to defense counsel's argument, or a
plea for law enforcement. See Guidry, 9 S.W.3d at 154; Cole, 194 S.W.3d at 544.

 We review the denial of a motion for mistrial under an abuse of discretion
standard. Hawkins v. State, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004); Davis v.
State, 177 S.W.3d 355, 363 (Tex. App.--Houston [1st Dist.] 2005, no pet.). Under
this standard, an appellate court must uphold an appellate court's ruling as long as the
ruling was within the zone of reasonable disagreement. Wead v. State, 129 S.W.3d
126, 129 (Tex. Crim. App. 2004).

 A mistrial is a device used to halt trial proceedings when error is so prejudicial
that expenditure of further time and expense would be wasteful and futile. Wood v.
State, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). It is appropriate only for "a
narrow class of highly prejudicial and incurable errors" and may be used to end trial
proceedings when the error is "so prejudicial that expenditure of further time and
expense would be wasteful and futile." Id.; Hawkins, 135 S.W.3d at 77. Thus, a trial
court properly exercises its discretion to declare a mistrial when, due to the error, an
impartial verdict cannot be reached or a conviction would have to be reversed on
appeal due to "an obvious procedural error." Wood, 18 S.W.3d at 648 (citing Sewell
v. State, 696 S.W.2d 559, 560 (Tex. Crim. App. 1983)).

 The State's improper jury arguments in this case are very similar to that made
by the State in Hogues v. State, Nos. 05-03-01567-CR & 05-03-01568-CR, 2005 WL
435106, at *9 (Tex. App.--Dallas Feb. 25, 2005, pet. ref'd). In Hogues, the State
argued to the jury:


 Let's talk particularly about some of the law. When I first read the
Charge on self-defense . . . the look on your faces was the same as mine. 
And I'm thinking to myself, well, how does self-defense apply to a case
like this? How does the Defendant get the right to say that he was acting
in self-defense, after he's shooting at a police officer?


 Well, what happens in a case, if there's any evidence at all, the
very smallest, minute of evidence, that raises the issue, then you're
going to get it in the Charge. The Court is not saying to you, Ladies and
Gentlemen of the Jury, I'm putting it in the Charge so there is some
merit in there.


Hogues, 2005 WL 435106, at *9. The appellant objected to the argument because it
"refer[red] to whether the Court has a merit or lack of merit to any issue in this
Charge." Id. The trial court sustained the objection and ordered the jury to disregard
the argument, but denied the appellant's request for a mistrial. Id. On appeal, the
appellant argued that the trial court should have granted the mistral because the
State's jury argument had "ask[ed] the jury to speculate as to the trial court's
evaluation of the issue and evidence." Id. The Dallas Court of Appeals agreed with
the appellant's characterization of the State's argument, but held that "any prejudice
arising from the prosecutor's argument was cured by the trial court's sustaining
appellant's objection and promptly instructing the jury to disregard the statement." 
Id. Thus, because a mistrial is only appropriate when the prejudice arising from an
improper argument is incurable and the trial court's instruction "left no question that
the court did not endorse the State's comment on the charge," the trial court had
"eliminated any danger of inappropriate speculation." Id.

 Here, as in Hogues, the State commented on the judge's beliefs about the case
by telling the jury that just because something was included in the charge did not
mean that the judge thought it was appropriate for appellant's case or that the judge
thought the jury needed to consider everything in the charge. See id. The trial court
sustained appellant's objection and instructed the jury to "refer to the Court's charge
during their deliberations" and "[f]ollow the law within the charge." Thus, like the
trial court in Hogues, the court "left no question that [it] did not endorse the State's
comment on the charge." See Hogues, 2005 WL 435106, at *9. We conclude,
therefore, that the trial court cured any prejudice created by the State's argument and
did not abuse its discretion in denying appellant's motion for a mistrial. See Hawkins,
135 S.W.3d at 76-77.

 We overrule appellant's fourth point of error.

TESTIMONY OF BERTHA ABRAHAM In his third point of error, appellant argues that the trial court erred when it
admitted Bertha's testimony about Abraham at the guilt-innocence stage of trial
because her testimony was irrelevant, inflammatory, and inadmissible character
evidence; the State questioned her "solely to inflame the jury"; and her "very
appearance on the witness stand, crying at the loss of her son, amounted to victim
impact evidence." The State responds that the trial court acted within its discretion
to admit the evidence and that her testimony about her son "merely allowed the jury
to see him as a real person."

 We review a trial court's decision to admit or exclude evidence under an abuse
of discretion standard. Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). 
A trial court has wide discretion in its decision to admit or exclude evidence. 
Edwards v. State, 178 S.W.3d 139, 145 (Tex. App.--Houston [1st Dist.] 2005, no
pet.). We will not reverse a trial court's ruling on the admission of evidence unless
that ruling falls outside the zone of reasonable disagreement. Burden v. State, 55
S.W.3d 608, 615 (Tex. Crim. App. 2001). 

 Relevant evidence is generally admissible. Tex. R. Evid. 402; Edwards, 178
S.W.3d at 146. The Texas Rules of Evidence define "relevant evidence" as "evidence
having any tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be without
the evidence." Tex. R. Evid. 401. Victim impact evidence--evidence concerning
the effect the victim's death will have on others, particularly the victim's family
members (5)--is irrelevant and thus inadmissible at the guilt-innocence phase of a trial
because it does not tend to make more or less probable the existence of any fact of
consequence with respect to guilt or innocence. Love v. State, 199 S.W.3d 447,
456-57 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd). Character
evidence--evidence concerning good qualities possessed by the victim--is also
inadmissible at the guilt-innocence phase of a trial unless it is offered to rebut
evidence to the contrary that has been properly admitted on behalf of the defense or
when the defense seeks to justify a homicide on the ground of threats made by the
victim. Fuentes v. State, 991 S.W.2d 267, 280 n.6 (Tex. Crim. App. 1999). 

 As its final witness, the State called Bertha Abraham. After asking some
preliminary questions, the State asked about Abraham, her youngest child. Defense
counsel immediately objected to any testimony from Bertha beyond that needed for
identification, arguing that her testimony, coupled with her crying, was "designed to
prejudice the jury" and was "of no probative value," and offered to stipulate to
Abraham's identity. Defense counsel further objected to any evidence the State might
offer concerning Abraham's character and any testimony concerning the history of
Abraham's family or Abraham's background as victim impact testimony. The court
sustained defense counsel's objection, admonishing the State, "No character
evidence. No victim impact." The State continued with questions about what
Abraham's family called him, his age at the time of his death, his birth date and
whether he had received any money on his last birthday, where he was living at the
time of his death, and what type of vehicle he drove. The State then questioned
Bertha about her son's education and athletic activities:

 [STATE]: Was [Abraham] working or going to school?

 [BERTHA]: He was going to school. He was a student at TSU. 
He--


 [DEFENSE]: I'm going to--


 [BERTHA]: He needed two more months to graduate.


 [STATE]: He was anticipating graduation in May 2003?


 [BERTHA]: Yes.


 [STATE]: What was his degree going to be in?


 [BERTHA]: Business.


 [STATE]: Did you know what his plans where going to be after he
graduated?

 [BERTHA]: Well--

 [DEFENSE]: Your Honor, I'm going to renew my earlier objection.

 

 [COURT]: Sustained.


 [DEFENSE]: Thank you.


 [STATE]: Did you know that--you've been here every day,
Ms. Abraham. And you've heard testimony that
[Abraham] was selling codeine.


 [BERTHA]: Yes.


 [STATE]: Had you known about that at the time? Did you
know about it?


 [BERTHA]: No, I did not.


 [STATE]: Were there any indications to you or your husband
that [Abraham] was involved in that kind of
activity?


 [BERTHA]: No, that's what's so strange about all of this.


 [STATE]: Did you ever know your son to have any type of
dealings like that?


 [BERTHA]: No.


 [STATE]: How did you find out that [Abraham] had been
killed?


 [BERTHA]: We got a phone call--


 [DEFENSE]: Again, Judge, I think it goes beyond the scope of--


 [COURT]: Sustained.


 . . . . 

 [STATE]: I'm going to show you some things in an envelope
that you brought to me, Ms. Abraham. I'd like for
you to pick out one of these things that we're going
to show the jury. Which one of these do you want
the jury to see?


 [DEFENSE]: Judge, again, at this time I think this is--I would
object to this line of questioning.


 [COURT]: Overruled.


 [STATE]: This one?


 [BERTHA]: (Nods head affirmatively.)


 [STATE]: Okay. I'm going to mark this [picture of several
young men in baseball uniforms] as State's Exhibit
No. 141. Which one of these is [Abraham]?


 [BERTHA]: No. 21 [referring to number on baseball jersey].


 . . . .


 [STATE]: [Abraham] was No. 21?


 [BERTHA]: Yes.


 [STATE]: What kind of team did he play on?


 [BERTHA]: He played baseball.


 [DEFENSE]: Judge--


 [BERTHA]: For a junior college, San Jacinto.


 [STATE]: Okay. What position did he play?


 [DEFENSE]: Judge, I object at this time.


 [BERTHA]: Sustained.


 . . . .


 [STATE]: What are the circumstances that this picture was taken?


 [BERTHA]: We were--


 [DEFENSE]: Judge, again, I think--


 [COURT]: Overruled.


 [BERTHA]: We were at the World Series in Grand Junction,
Colorado.


 [STATE]: Okay. And [Abraham] was on a team that played in
the World Series?


 [BERTHA]: Yes. 


 Bertha's testimony did not make the existence of any fact of consequence
concerning appellant's guilt any more or less probable. See Tex. R. Evid. 401; see
also Motilla v. State, 78 S.W.3d 352, 354, 359 (Tex. Crim. App. 2002) (holding that
testimony from victim's mother about adoption of her son, his health and age, and
fact that he had a twin brother was "irrelevant" and "bore no relationship to the sole
contested issue" in case). Rather, it painted a picture of a young man with a
promising future whose life appellant had ended prematurely. Such a picture of the
victim improperly invited the jury to consider his worth and value to society in
determining appellant's guilt. Cf. Renteria v. State, 206 S.W.3d 689, 706 (Tex. Crim.
App. 2006) (noting that mother's testimony about slain five-year-old daughter was
not offered for constitutionally improper purpose such as inviting the jury to find
appellant more deserving of punishment by comparing victim's worth to other
members of society). Moreover, the fact that Bertha was crying as she testified
improperly appealed to the jury's sympathy for Bertha and her family and invited the
jury to return a verdict based on emotion rather than the evidence presented at trial. 
See Soto v. State, 156 S.W.3d 131, 136 (Tex. App.--Fort Worth 2005, pet. ref'd)
("Evidence is unfairly prejudicial if it inflames and prejudices the jury to the point
that it creates an undue tendency to suggest a verdict on an improper basis, such as
an emotional basis."). Based on the forgoing, we conclude that Bertha's testimony
about her son was irrelevant and inflammatory and that the trial court abused its
discretion in admitting her testimony. See Torres, 71 S.W.3d at 760.

 Having found that the trial court abused its discretion, we must determine
whether the error harmed appellant. See Tex. R. App. P. 44.2(b). The erroneous
admission of evidence is nonconstitutional error and will be considered harmless if,
after examining the record as a whole, we are reasonably assured that the error did not
affect appellant's substantial rights--i.e., the error did not have a substantial and
injurious effect or influence in determining the jury's verdict. See id.; Garcia v.
State, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004). In examining the record, we
may not determine harm simply by examining whether the State presented
overwhelming evidence of guilt. Motilla, 78 S.W.3d at 356. Rather, we must
"calculate as much as possible the probable impact of the error on the jury in light of
the existence of the other evidence." Id. If the evidence of guilt was overwhelming
and thus dissipated the error's effect upon the jury's function in determining the facts
such that it did not contribute to the verdict, the error is harmless; otherwise, it is not. 
Harris v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).

 At trial, the State presented evidence that appellant fired shots at Abraham. 
Lewis testified he saw appellant shoot into Abraham's truck, and, according to
Detective Swainson, appellant admitted to participating in the shooting. Hurst also
acknowledged that he had told Detective Swainson that he had seen appellant fire
shots. The State also presented evidence from which the jury could have inferred that
appellant formed the intent to rob Abraham prior to or at the time of the shooting. 
First, Lewis testified that after he saw appellant shoot into Abraham's truck, he saw
appellant reach into the truck and grab a duffel bag that, Lewis later learned,
contained codeine. Thus, the theft occurred immediately after the murder, evidence
from which the jury could have inferred that appellant had formed the intent to steal
the codeine prior to or at the time of the shooting. See McGee, 774 S.W.2d at 234
(noting that Court of Criminal Appeals has held numerous times that proof that
robbery occurred immediately after commission of murder is sufficient to prove that
murder committed in course of committing robbery); Meeks, 135 S.W.3d at 112
(noting that Court of Criminal Appeals has held that intent can be inferred from theft
occurring immediately after a murder).

 Second, both Lewis and Hurst testified that at the time of the shooting
appellant needed money. According to Lewis, appellant "was stressing a lot about
money, about not having money." Hurst testified that he believed that appellant
"needed a little money" to get ready for the birth of his daughter. Lewis further
testified that appellant sold codeine--Lewis had purchased codeine from appellant
on more than 50 occasions--but, on the night of the shooting, he had none. Lewis
also testified that appellant used codeine. From this testimony, the jury could have
inferred that appellant planned to steal the codeine from Abraham because he wanted
to sell it or because he wanted to consume it, or both, but had no money to pay for it. 
Third, on the night of the shooting, appellant first spoke to Abraham alone. Appellant
then returned to his car, opened the door, and, when asked what he was doing, said,
"I am acting like I am looking for money." From this statement, the jury could have
inferred that appellant had no intention of buying codeine from Abraham, but rather
that he had already formed the intent to steal it from him.

 On the other hand, Lewis admitted that before the shooting, he had smoked
marijuana and had consumed Xanax and that, as a result, he could not remember
everything that happened that night. Lewis also admitted that in May 2003, he,
appellant, and appellant's cousin had been arrested in Louisiana for possession of
codeine, marijuana, cocaine, and Oxcycoton. According to Lewis, most of the drugs
belonged to appellant; none, except a "little marijuana," belonged to Lewis. 
Although Lewis denied being angry at appellant for what had happened, Lewis did
admit that appellant could have claimed that he, not Lewis, owned most of the drugs
in the car. Lewis further admitted that he told Cooper that appellant had wronged him
in Louisiana. Finally, Lewis denied telling Cooper that appellant had not shot
Abraham, but then acknowledged that if he had really seen appellant shoot someone,
he would not have continued to "hang out" with him.

 Although Hurst had consumed Xanax on the night of the shooting and at first
claimed that he did not see anyone shooting because he was asleep at the time, he
later testified that after the gunshots awakened him, he saw Collins running back to
the car with a duffel bag. Collins then got into the back seat of the car with Hurst, put
a gun to his head, and threatened him not to say anything about what had just
happened. Collins then opened the duffel bag and pulled out five or six pints of
codeine. Later in his testimony, however, when the State asked if he saw appellant
reach into Abraham's truck and grab the duffel bag, Hurst said, "I seen somebody
lean and snatch something out of the car." Hurst acknowledged, however, that he had
told Detective Swainson that appellant had grabbed the bag. Moreover, when the
State asked Hurst if appellant had a gun in his hand as he was running back to his car,
Hurst testified, "I was in the back seat. I don't remember that. I don't think he had
no gun in his hand. I can't remember if he did," but then later testified, "I didn't see
[appellant] with no gun at the time of the shooting."

 Cooper testified that when she saw Lewis at a party in April 2005 and said to
him that they both knew appellant had not shot Abraham, Lewis agreed, saying,
"[Y]es, I know he didn't." Detective Swainson testified that up to the point where he
says appellant admitted to participating in the shooting, appellant had maintained that
there had been no plan to steal the codeine that night and that he was not the shooter. 
Appellant claimed, rather, that Collins had shot both guns and had also reached for
the duffel bag holding the codeine.

 Given the record before us, we conclude that Bertha's testimony about her son
did not have a substantial and injurious effect or influence in determining the jury's
verdict. See Garcia, 126 S.W.3d at 927. Although her testimony about her son was
inflammatory and irrelevant to appellant's guilt, we cannot ignore the fact that the
record contains ample evidence to support appellant's conviction for murder
committed during the course of a robbery. See Motilla, 78 S.W.3d at 356; Harris,
790 S.W.2d at 587.

 We overrule appellant's third point of error.

MISSTATEMENT OF THE LAW

 In his fifth point of error, appellant contends that the trial court erred in
overruling an objection to the State's misstatement of the law during its closing
argument. More specifically, he argues that when the court overruled his objection,
it effectively approved the State's misstatement of the law that the jury could convict
appellant based on things he had done that, in the end, had helped Collins commit the
crime--i.e., the jury could convict appellant because he had unwittingly aided Collins
in committing the crime. This misstatement, according to appellant, harmed him
because it addressed the jury's deliberations on the most important aspects of the case
and affected the ultimate verdict chosen by a divided jury. The State responds that
it accurately explained the law of parties to the jury.

 During closing argument, both the State and defense counsel are entitled to
give a reasonable and proper explanation of the law contained in the jury charge. 
Wilder v. State, 583 S.W.2d 349, 362 (Tex. Crim. App. 1979); Grant v. State, 738
S.W.2d 309, 311 (Tex. App.--Houston [1st Dist.] 1987, pet. ref'd). Neither side,
however, may make a statement of what purports to be the law when that statement
of law is not contained in the charge. Grant, 738 S.W.2d at 311. Moreover, any
argument to the jury that misstates or is contrary to the law contained in the court's
charge is erroneous and an improper jury argument. Melendez v. State, 4 S.W.3d 437,
442 (Tex. App.--Houston [1st Dist.] 1999, no pet.), overruled on other grounds by
Small v. State, 23 S.W.3d 549, 550 (Tex. App.--Houston [1st Dist.] 2000, pet. ref'd);
Grant, 738 S.W.2d at 311. Thus we must determine whether the State's jury
argument concerning the law of parties misstated or was contrary to the law as stated
in the charge. See Melendez, 4 S.W.3d at 442; Grant, 738 S.W.2d at 311.

 Regarding the law of parties, the court's charge stated:

 A person is criminally responsible as a party to an offense if the offense
is committed by his own conduct, by the conduct of another for which
he is criminally responsible, or by both.


 A person is criminally responsible for an offense committed by
the conduct of another if, acting with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or
attempts to aid the other person to commit the offense. Mere presence
alone will not constitute one a party to an offense.


 . . . .


 Before you would be warranted in finding the defendant guilty of
capital murder [as a party] . . . you must find from the evidence beyond
a reasonable doubt that the defendant, Albert Paul Durand, Jr., with the
intent to promote or assist in the commission of the offense of robbery,
if any, solicited, encouraged, directed, aided, or attempted to aid . . .
Collins in shooting Nathan Bradley Abraham, if he did, with the
intention of thereby killing [him]; . . . .






 The complained of jury argument is as follows:

 [STATE]: But next consider parties. He is also guilty of
capital murder if he's a party to the charge; and what
I mean by that is did he solicit, encourage, direct,
aid, or attempt to aid [Collins] to commit the crime. 
If you believe that [Collins] through the course of a
robbery killed [Abraham] and that the defendant
helped him do so, he's guilty of capital murder. 
That's the second way. And how is he guilty of
that? He provides the car, he provides the location,
he provides the gun, he provides Abraham, he
provides the codeine. He, the defendant, gives all
those things to [Collins] to help him or encourage
[him] to commit the crime. And again, that comes
down to two shooters, two guns. Even if--



 [DEFENSE]: Judge, I hate to interrupt, but I am going to object
because that's a misstatement because he still has to
intend that [Collins] committed [sic] an offense. 
Just driving him somewhere--


 [COURT]: Okay. The jury will refer to the Court's charge in
the instructions.


 [DEFENSE]: I will object to that as [an] improper statement of the
law.


 [COURT]: Overruled.


 [STATE]: That's what this says. Of course, he's got to act with
intent to promote or assist the commission of the
offense. Absolutely. If you believe that he was just
driving around not knowing what was going on, if
you believe that--but if you believe that, certainly
he's not guilty. He has to aid [Collins] to commit
the crime and he has to intend to commit the crime
by helping [Collins].


 Based on the language in the jury charge, the State had to prove two things in
order to convict appellant as a party: (1) that appellant solicited, encouraged, directed,
aided, or attempted to aid Collins in shooting Abraham and (2) that appellant did so
with the intent to promote or assist in the commission of the robbery. Although we
think that the State's explanation of the law of parties to the jury was less than clear,
we do not think that it conveyed to the jury that it could convict appellant of capital
murder because he had unwittingly helped Collins commit the crime. Furthermore,
even though the court overruled appellant's objection, the prosecutor nevertheless
stated, "Of course, he's got to act with intent to promote or assist the commission of
the offense. Absolutely. If you believe that he was just driving around not knowing
what was going on . . . certainly he's not guilty." Thus, we conclude that the State's
explanation of the law of parties did not misstate and was not contrary to the law
contained in the court's charge and, therefore, it was not improper. See Melendez, 4
S.W.3d at 442; Grant, 738 S.W.2d at 311.

 We overrule appellant's fifth point of error.







CONCLUSION

 We affirm the judgment of the trial court.


 

 Evelyn V. Keyes

 Justice


Panel consists of Justices Nuchia, Keyes, and Higley.


Do not publish. Tex. R. App. P. 47.2(b).
1. See Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3613
(amended 2003) (current version at Tex. Pen. Code Ann. § 19.03(a)(2) (Vernon Supp.
2006)). 
2. Testimony at trial established that a 9 mm gun belonging to appellant's cousin, Angel Allen,
had been stolen from her car.
3. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).
4. §  
 § 
 
5. Renteria v. State, 206 S.W.3d 689, 706 (Tex. Crim. App. 2006)
.